# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| Slep-Tone Entertainment Corp. | ) | |
| | ) | Case No. 1:10-cv-00990 |
| Plaintiff, | ) | |
| | ) | Judge Nugent |
| v. | ) | |
| | ) | |
| Karaoke Kandy Store, Inc., et al. | ) | |
| | ) | **DEFENDANTS' TRIAL BRIEF** |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' TRIAL BRIEF

Defendants Karaoke Kandy Store, Inc. and Charles A. Polidori, through counsel submit the following Trial Brief to assist the Court in preparing the case for trial.  The Plaintiff has recently suggested that no trial by jury is available.  The Defendants respectfully submit that there are a number of facts that should properly be determined by a jury.  Therefore, Defendants attach proposed jury instructions and *voir dire* questions for the Court's consideration.

Respectfully submitted,

s/ John J. Okuley
Trial Attorney
John J. Okuley, Esq. (0076748)
Okuley Smith, LLC
Mueller-Smith Building
7700 Rivers Edge Drive
Columbus, OH 43235-1355
Tel.: 614-436-0600
Fax.: 614-426-0057
Email: *jokuley@okuleysmith.com*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii-iv

I.      INTRODUCTION ..........................................................................................1

II.     DEFENDANTS' BRIEF STATEMENT OF FACTS .....................................1

III.    STANDARDS OF LAW FOR TRADEMARK INFRINGEMENT .............6

IV.    STANDARDS FOR ISSUANCE OF A PERMANENT INJUNCTION ...................12

V.     EVIDENTIARY ISSUES THAT MAY ARISE AT TRIAL ........................15

VI.    ATTACHMENTS ........................................................................................16

VII.   CERTIFICATE OF SERVICE ...................................................................17

## TABLE OF AUTHORITIES

Ameritech, Inc. v. Am. Info. Techs. Corp., 811 F.2d 960, 964 (6th Cir. 1987) ...........................13

AutoZone, Inc. v. Tandy Corp., 373 F.3d 786 (6th Cir. 2004)......................................................11

Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) ................................................13

Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n., 110 F.3d

   318 (6th Cir.1997) ...............................................................................................................12, 13

Certified Restoration Dry Cleaning, 511 F.3d at 542 ...................................................................13

Champions Golf Club v. Champions Golf Club, 78 F.3d 1111 (6th Cir. 1996) ...........................10

Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr., 109 F.3d 275 (6th Cir.

   1997) ...............................................................................................................................7, 8, 10

Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S.Ct. 2041 (2003) .............7

Doran v. Salem Inn, Inc., 422 U.S. 922 (1975) .............................................................................12

eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006) ......................................................12

Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642 (6th Cir. 1982).......8-11

Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100 (6th Cir.

   1991) ............................................................................................................................................13

In re DeLorean Motor Co., 755 F.2d 1223 (6th Cir. 1985) .............................................................6

In re Eagle-Picher Indus., Inc., 963 F.2d 855 (6th Cir. 1992) ......................................................12

Int'l Longshoreman's Ass'n., AFL-CIO, Local Union No. 1937 v. Norfolk S. Corp., 927

   F.2d 900 (6th Cir. 1991) ...........................................................................................................12

Kellogg Co. v. Toucan Golf, Inc., 337 F.3d 616 (6th Cir. 2003) .....................................................7

Leelanau Wine Cellars v. Black & Red, 502 F.3d 504 (6th Cir. 2007).........................................11

Little Caesar Enter., Inc., v. R-J-L Foods, Inc., 796 F.Supp. 1026 (E.D. Mich. 1992)................12

Lorillard, 453 F.3d at 383  ............................................................................................................13

Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171 (6th Cir. 1995) .......................................12

Overstreet v. Lexington-Fayette Urban County Gov't., 305 F.3d 566, 578 (6th Cir. 2002) ........13

Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 105 S.Ct. 658 (1985)....................9,13

Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373 (6th Cir. 1995) ........12, 14

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814, 65 S. Ct. 993

   (1945)...........................................................................................................................................14

Sandison v. Michigan High Sch. Athletic Ass'n., 64 F.3d 1026 (6th Cir. 1995) ..........................12

The Scooter Store, Inc. v. Spinlife.com, LLC, 2011 WL1460438, at *6 (S.D. Ohio, Apr. 18,

   2011)............................................................................................................................................14

Synanon Found., Inc. v. California, 444 U.S. 1307 (1979)............................................................12

Too, Inc. v. The TJX Cos., Inc., 229 F.Supp.2d 825 (S.D. Ohio 2002) ...........................................7

Two Pesos Inc. v. Taco Cabana Inc., 505 U.S. 763, 112 S.Ct. 2753 (1992)..............................9,13

U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185 (6th Cir. 1997)..................................7

Worthington Foods, Inc. v. Kellogg Co., 732 F.Supp. 1417 (S.D. Ohio 1990) .......................6, 13

## STATUTES

15 U.S.C. § 6 (2008) ...............................................................................................................3

15 U.S.C. § 1052 (2008) ..........................................................................................................7

15 U.S.C. § 1057 (2008) ..........................................................................................................8

15 U.S.C. § 1065 (2008) ........................................................................................................3, 8

15 U.S.C. § 1114 (2008) ..........................................................................................................9

15 U.S.C. § 1115 (2008) ..........................................................................................................3

15 U.S.C. § 1125 (2008) ..........................................................................................................9

15 U.S.C. § 1127 (2008) ........................................................................................................6, 9

## OTHER

J. McCarthy, McCarthy on Trademarks and Unfair Competition § 3:2 (2001) ...................7

## I. INTRODUCTION

Plaintiff, Slep-Tone Entertainment Corp. (Slep-Tone) brings this case to trial as a mere shadow of the alleged acts in the Complaint.  Plaintiff now disclaims "all damages in connection with this action," and seeks injunctive relief only.  For injunctive relief to be available, the plaintiff must still prove that the defendants used a valid mark of the plaintiff in commerce, and that there is a likelihood of confusion as a result.  The plaintiff cannot prove use in commerce by the defendants, nor that there is a likelihood of confusion. Under the circumstances, SLEP-TONE has not met its burden to show trademark infringement as a matter of law, and is not entitled to any relief requested. The defendants seek a finding of fact that no equitable relief is available under the law to plaintiff, and that defendants prevail on all counts.

## II. DEFENDANTS' BRIEF STATEMENT OF FACTS

Defendant Charles Polidori (Polidori) has been involved in the karaoke business since the 1990's (Stipulations of Fact at ¶32) (Stip. at ¶ 32). Mr. Polidori had become enamored with karaoke and did what he could to become involved in the industry.  At first, Mr. Polidori acted as a karaoke jockey (KJ), presenting karaoke shows in the Cleveland area (Stip. at ¶ 47). At karaoke shows, a KJ takes music requests from karaoke participants and plays their chosen songs in a format that provides music and lyrics, but not a lead vocal track. (Compl. at ¶ 14; stip. at ¶ 48).  The participant then provides the lead vocals, according to the participant's abilities. (Compl. at ¶ 14).  The music format is a specially encoded format known as "CD+G" (compact disc plus graphics). (Compl. at ¶ 13; stip. at ¶ 49). CD+G recordings are encoded to provide a synchronized graphical display of the lyrics in order to aid the participant in singing along as the

-1-

"lead singer." (Compl. at ¶ 14; stip. at ¶ 50).

Successful KJs have available a library of music that the participants are likely to wish to sing. (Stip. at ¶ 51).  The desirable songs typically include the newest popular hits (e.g., Katy Perry or Jay Z) and musical standards (e.g., Johnny Cash or Elvis Presley). (Stip. at ¶ 52).  Until the late 1990's the practice in the karaoke industry was for producers of karaoke CD+G recordings to obtain licenses from publishers for the creation of the karaoke derivative works of the original songs. (Ex. DX-47, "Music label hits inharmonious key." Nashville Post Feb. 24, 2003.)  These licenses add to the expense of the karaoke CD+Gs. (Compl. at ¶ 20.)  The cost of the music library for serious KJs can be significant, with many presenters' libraries exceeding thousands songs. (Stip. at ¶ 53).  Packages of fully licensed songs can cost upwards of $3,000. (Stip. at ¶ 27).

KJs have become substantial consumers of equipment and musical works. (Stip. at ¶ 54). Mr. Polidori became engaged in the sales and service end of the karaoke industry, providing karaoke music, equipment, and related services. (Stip. at ¶ 55). Mr. Polidori was involved in several related businesses involving different owners and multiple physical locations. (Stip. at ¶ 56).  One of these businesses was incorporated as Karaoke Kandy Store, Inc. (Karaoke Kandy Store) in 1995. (Ex. DX-39, Incorporation certificates). Another business is Lightyearmusic.com, Inc., which was incorporated in 2001.[1] (Ex. DX-39. *See also* Ex. DX-54, Interrogatory responses at 1-2; stip. at ¶ 34).  Some of Mr. Polidori's businesses operated one physical retail store as a tenant at 5361 Pearl Road, Parma, Ohio 44129. (Compl. at ¶ 2; stip. at ¶ 58).  The businesses also engaged in sales and service over the Internet.

---

[1] Lightyearmusic.com, Inc. was identified in the Complaint as an entity associated with Polidori, but is not a party to this litigation.

Since beginning in the industry and continuing through the present, sales of CD+G compact discs has been a source of business revenue for Mr. Polidori's businesses. (Stip. at ¶ 59).  A number of producers of karaoke CD+G recordings have offered extensive music catalogs, including Chartbusters, Pop Hits Monthly, and Slep-Tone, which sold under the Sound Choice label. (Stip. at ¶ 60).  Karaoke Kandy Store obtained CD+Gs from a number of distributors, including D.J. Miller Music of Boulder, CO, ProSing of Pinellas Park, FL, and Personnel Concepts of San Dimas, CA (*e.g.*, Ex. DX-40, Selected invoices; stip. at ¶ 61).  ProSing was for a time operated through Slep-Tone (Ex. DX-44 at ¶¶ 7-8; stip. at ¶ 62).  Large quantities of CD+G product, including those from ProSing, were ordered by and shipped to Karaoke Kandy Store. (Stip. at ¶ 64).  Payments to vendors were made from bank accounts owned by Karaoke Kandy Store. (Ex. DX-43; Dep. of J. Polidori, at 66; stip. at ¶ 65).

Similar to the problem of unauthorized digital reproduction of popular music, digital reproduction of karaoke music CD+Gs became widespread. (Stip. at ¶ 66).  KJs who legally acquired legitimate CD+Gs faced competition from KJs who acquired unlicensed music, which was available through multiple unidentified parties. (Stip. at ¶ 16).  Competition from KJs using unlicensed music created significant financial pressure on legitimate KJs to skirt or ignore the law. (Stip. at ¶ 38).

At about the same time as digital reproduction became common, certain producers of CD+G music, including Slep-Tone, failed to obtain copyright licenses from the music publishers. (Ex. DX-48, Declaration of C. Costello, Slep-Tone employee at ¶ 7. *See also*, e.g., Ex. DX-49 Complaint, *Famous Music v. Slep-Tone et al*. at ¶¶ 15-20).  After agreeing to an injunction against copyright infringement in 2006 (Ex. DX-55 Motion re. violation of Injunction at ¶ 1) and

suffering significant reductions in revenue (*see* Ex. DX-56, Aug. 31, 2007 letter to Judge Foley, with attachments), in May 2007, Slep-Tone sold its existing catalog of karaoke music masters to Sting Ray Digital Music Group, of Montreal, Canada (Stip. at ¶ 69).  Slep-Tone received a license to certain rights, and continued to sell its existing inventory and to make new copies of music media from their existing catalog. (Stip. at ¶ 70).  Slep-Tone has sold its products on the Internet via a website located at *soundchoice.com*. (Stip. at ¶ 7).  Slep-Tone's business fortunes continued to decline, to the point that Slep-Tone admitted to being unable to produce new products. (Ex. DX-56; Ex. DX-53, Statement from Kurt Slep dated Feb. 27, 2010; stip. at ¶ 71).

Karaoke Kandy Store and Mr. Polidori also suffered business reverses, in part due to intense competition from those engaged in selling unauthorized digital reproductions. By the end of 2008, Karaoke Kandy Store ceased to be a going concern. (Stip. at ¶ 72).  Mr. Polidori continued to operate other businesses, including Lightyearmusic.com, Inc.  For some time prior, Mr. Polidori had been in communication with Slep-Tone, urging them to act to reduce unauthorized sales of hard disk drives loaded with music. (Stip. at ¶ 73). Unbeknownst to Mr. Polidori, several former employees and later competitors, including Jeff De Leva, Rob Shumaker, and Michael McNeil, were acting as "informants," feeding Slep-Tone information of dubious veracity. (Ex. DX-38).  Slep-Tone encouraged local police to take action against Mr. Polidori, but in light of the evidence, no law enforcement action was taken against Mr. Polidori's businesses. (Ex. DX-59).  Later, Slep-Tone initiated the present litigation, which named only Karaoke Kandy Store and Mr. Polidori personally. (*See generally*, Compl.). Slep-Tone deposed the father and brother of Mr. Polidori, who are non-parties to the suit, but did not depose either Charles Polidori or Karaoke Kandy Store.  Though obviously aware of the location and business

-4-

operations of Lightyearmusic.com, and its association with Mr. Polidori, the Plaintiff brought litigation against only a defunct corporation and one of its former officers, in his capacity as a officer. (Stip. at ¶ 74).

Through the conclusion discovery, Slep-Tone has generally failed to adduce specific evidence demonstrating that the Defendants made an unauthorized use of Slep-Tone's marks. Though Slep-Tone did depose the father and brother of Mr. Polidori, non-parties to the suit, it did not depose either Charles Polidori or Karaoke Kandy Store.  In essence, Slep-Tone decided to forgo significant discovery, and rested its case on the allegations of the Complaint. Prior to the close of discovery, Slep-Tone did not even seek to inspect the defendants' premises or equipment.

Though the defendants made numerous discovery requests, Slep-Tone never identified or produced any merchandise that demonstrated unauthorized copyrighted music originated from the defendants. Likewise, even though an affidavit from Kurt Slep stated otherwise, Slep-Tone never produced physical evidence that demonstrated any use of the Sound Choice marks other than in the course of sale of authorized goods.

In surviving defendants' motions for summary judgment, Slep-Tone relied on affidavit testimony of Robert Shumaker and Jeff DeLeva. Defendants seek to exclude such testimony from trial on the basis of its unreliability and that Slep-Tone improperly failed to disclose the potential witnesses until the end of discovery, preventing Defendants from deposing the witnesses. Plaintiff provided a potential expert witness report of David Sems.  The report of Sems fails to establish that Slep-Tone's karaoke recordings, were copied and sold by Kandy Store without the authorization of Slep-Tone. Slep-Tone has failed to produce *any evidence* to

demonstrate that the electronic devices examined by Sems were purchased from Karaoke Kandy Store. Defendants seek to exclude the report of Sems as an expert report on the basis that it provides no reliable opinion of a qualified expert. Without the testimony of Shumaker or DeLeva, or expert testimony from Sems, The plaintiff is without evidence sufficient for a *prima facie* case of trademark infringement, let alone a finding of a likelihood of confusion.

## III.  STANDARDS OF LAW FOR TRADEMARK INFRINGEMENT.

With the plaintiff's disclaimer of any claim for damages, the plaintiff's claims for equitable relief rest solely on a determination that the defendants have engaged in infringement of a registered trademark. The Lanham Act defines a cause of action for infringement of a federally registered trademark as arising against those who-

without the consent of the registrant –
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. 15 U.S.C. §1114(1)(a).

Before addressing the law of trademarks, a brief overview of what a trademark is may prove helpful.  The definition of a trademark is set forth in the federal Lanham Act § 45 as being: "…any word, name, symbol or device, or any combination thereof – used by a person to identify and distinguish his or her goods…from those manufactured or sold by others, and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (2008); see Worthington Foods, Inc. v. Kellogg Co., 732 F.Supp. 1417, 1429 (S.D. Ohio 1990).  In general, trademarks perform four functions that are deserving of protection in the courts:

-6-

(1)    to identify one seller's goods and distinguish them from goods sold by others;

(2)    to signify that all goods bearing the trademark come from or are controlled by a single, albeit anonymous, source;

(3)    to signify that all goods bearing the trademark are of an equal level of quality; and

(4)    as a prime instrument in advertising and selling the goods.

J. MᴄCᴀʀᴛʜʏ, MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 3:2 (2001).   In addition to the four functions of a trademark identified by Professor McCarthy, a trademark is also the objective symbol of the goodwill that a business has built up. Id.

The Lanham Act intends to "make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in…commerce against unfair competition.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28, 123 S.Ct. 2041, 2045 (2003) (quoting 15 U.S.C. § 1127).  Section 32(1) provides for a cause of action for the owners of federally registered trademarks. 15 U.S.C. § 1114(1); see also, Kellogg Co. v. Toucan Golf, Inc., 337 F.3d 616, 623 (6th Cir. 2003).  The cause of action accrues upon (1) unauthorized use of a registered trademark when (2) selling or advertising a good or service, when such use is (3) likely to confuse or deceive consumers. U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1188 (6th Cir. 1997); Too, Inc. v. The TJX Cos., Inc., 229 F.Supp.2d 825, 829 (S.D. Ohio 2002).  The "touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion...." Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr., 109 F.3d 275, 280 (6th Cir. 1997).

To prove trademark infringement, Slep-Tone must prove that it has valid marks entitled to protection, that defendants made unauthorized use of those marks, while selling a product in

commerce and that the defendants unauthorized sales that are <u>likely to result in confusion</u> with Slep-Tone's marks. 15 U.S.C. §§ 1114(1), 1125(a); <u>Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center</u>, 109 F.3d 275, 288 (6th Cir. 1997).

As a threshold matter, the plaintiff needs to show <u>use</u> by the defendants in commerce, and that the use was not either authorized by Slep-Tone, or protected under fair use, and that the complained of acts arose from <u>defendants' sales.</u> Slep-Tone must therefore prove sufficient specific facts to demonstrate unauthorized use of its marks by *Defendants* in particular.

If the threshold facts can be proven Slep-Tone must demonstrate a likelihood of confusion. Note that Slep-Tone has not sought to use any survey evidence or other expert testimony to support a factual finding of likelihood of confusion. Some of the criteria helpful for determining likelihood of confusion are identified in <u>Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.</u>, 670 F.2d 642 (6th Cir. 1982).  When considering whether a likelihood of confusion exists, courts in the Sixth Circuit must examine and weigh the eight *Frisch's* factors:

1. strength of the senior mark;
2. relatedness of the goods or services;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. the intent of defendant in selecting the mark; and
8. likelihood of expansion of the product lines.

<u>Daddy's Junky Music Stores</u>, 109 F.3d at 280 (citing <u>Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.</u>, 670 F.2d 642, 648 (6th Cir. 1982).  Further guidance regarding the application of these factors from the Sixth Circuit instructs that

[t]hese factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely.  They are also interrelated in effect.  Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case.  But a thorough and analytical treatment must nevertheless be attempted.  The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1107.

With respect to the first Frisch's factor,

Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. . . . The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection.

Two Pesos Inc. v. Taco Cabana Inc., 505 U.S. 763, 768, 112 S.Ct. 2753, 2757 (1992), reh'g

denied, 505 U.S. 1244, 113 S.Ct. 20. A mark that is merely descriptive describes "the qualities or

characteristics of a good or service, and this type of mark may be registered only if the registrant

shows that it has acquired secondary meaning, i.e., it 'has become distinctive of the applicant's

goods in commerce.'" Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S.Ct.

658, 661 (1985) (quoting 15 U.S.C. §§ 1052(e), (f)).

The mark "SOUND CHOICE" and its figurative derivations has been in use for more

than five years, and is presumably distinctive. Nonetheless the mark has an inherent level of

descriptiveness, and thus is only a moderately strong mark.  There is no evidence that the

SOUND CHOICE marks are famous.  Slep-Tone has used the mark "SOUND CHOICE" as a

trademark and has been providing products under the related but has taken actions that diminish

the strength of the mark. First, Slep-Tone has allowed a number of different merchants to use the

-9-

marks without exercising quality control.  In particular, Slep-Tone transferred its intellectual property rights in is karaoke music masters to Stingray Digital Music in about 2006.  Thus, since 2006, Sting Ray has distributed karaoke music bearing SOUND CHOICE trademarks, without supervision by Slep-Tone.  In addition, Slep-Tone ceased sale of karaoke music for a period of years, following being enjoined from reproducing certain of its masters for copyright violations.  During that period both authorized and unauthorized parties have distributed karaoke music under the SOUND CHOICE name with no connection to the trademark holder Slep-Tone. Thus at best the strength of the SOUND CHOICE marks to identify Slep-Tone as a source of karaoke music have been diminished by naked licensing by Slep-Tone, and Slep-Tone's laxity in policing use of its mark by others. At worst, Slep-Tone has abandoned its exclusive rights to the SOUND CHOICE marks.

The goodwill associated with the "SOUND CHOICE" marks has not been made part of the evidence presented, nor is it clear whether the consuming public is aware of SOUND choice as an indicator of quality.

The second Frisch's factor to consider is the relatedness of the goods or services.  Goods and services are related if they "'are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company.'" Daddy's Junky Music Stores, 109 F.3d at 282-283 (quoting Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1109 (6th Cir. 1991)).  The question then becomes whether the goods and services are "'related so that they are likely to be connected in the mind of a prospective purchaser[.]'" Id.

To succeed in its claims Slep-Tone must prove that the occasional display of the sound

choice mark during karaoke performances leads consumers of the goods to conclude that the provider of the equipment is somehow associated with the producer of the music background tracks. While the goods and services offered by Defendant may not be identical, they are also not sufficiently related that they are "likely to be connected in the mind of a prospective purchaser."

The Sixth Circuit evaluates the effect of the relatedness factor "by assigning the dispute in question to a place within a 'tripartite system.'" Leelanau Wine, 502 F.3d at 516 (quoting AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 798 (6th Cir. 2004)). Facts demonstrating that the parties directly compete warrant a finding that "'confusion is likely if the marks are sufficiently similar.'" Id. When parties have "'somewhat related, but not competitive'" goods and services, "the likelihood of confusion determination will turn on one of the other seven factors." Id. Unrelated products make a likelihood of confusion finding "'highly unlikely.'" Id.

The third Frisch's factor, the similarity of the marks, is alleged by plaintiff that the competing marks are identical. The issue of nominative fair use is relevant however, because legitimate purchasers of SOUND CHOICE products must be able to identify the products in use. Thus, the intent of defendant in selecting the mark is to identify genuine SOUND CHOICE products. Along the same lines, the marketing channels used are different, with the mark being displayed to karaoke performers, but marketed to karaoke presenters. Those presenters have not been shown to have particular preference for CD+G tracks produced by any particular distributor, and thus are not known to exercise any significant degree of purchaser care.

The fourth Frisch's factor, is not relevant to this case, as there has been no evidence of actual confusion produced. Likewise, there is little likelihood of expansion of the SOUND CHOICE product lines, as Slep-Tone no longer produces new CD+G tracks.

-11-

## IV.    STANDARDS FOR ISSUANCE OF A PERMANENT INJUNCTION.

The plaintiff seeks equitable relief. The grant or denial of an injunction is premised on the traditional equitable grounds of a likelihood of irreparable injury to the movant if the injunction is not issued and the movant's demonstration of a likelihood of confusion between the parties' goods. Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975).  The decision to grant or deny a injunction is entrusted to the sound discretion of the trial court, exercised consistent with traditional principles of equity. eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006). See also, Synanon Found., Inc. v. California, 444 U.S. 1307 (1979); Sandison v. Michigan High Sch. Athletic Ass'n., 64 F.3d 1026, 1030 (6th Cir. 1995). After eBay, determining whether issuance of an injunction is proper depends on analysis of four particularly important factors:

1.    whether the injunction will save the plaintiff from irreparable injury;

2.    whether the plaintiff has an adequate remedy at law;

3.    whether the balance of hardships would tip in the plaintiff's favor or whether issuance of the injunction would bring harm others; and

4.    whether the public interest would be served by the injunction.

547 U.S. at 391. See also Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n., 110 F.3d 318, 322 (6th Cir.1997); Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171 (6th Cir. 1995); Performance Unlimited, 52 F.3d 1373 (6th Cir. 1995); In re Eagle-Picher Indus., Inc., 963 F.2d 855, 858 (6th Cir. 1992); Int'l Longshoreman's Ass'n., AFL-CIO, Local Union No. 1937 v. Norfolk S. Corp., 927 F.2d 900, 903 (6th Cir. 1991).

In the Sixth Circuit, the foregoing factors are to be balanced, and are not prerequisites to be met. Little Caesar Enter., Inc., v. R-J-L Foods, Inc., 796 F.Supp. 1026, 1030 (E.D. Mich. 1992) (citing In re DeLorean, 755 F.2d 1223, 1229 (6th Cir. 1985).  Further, though none of these

factors is to be deemed conclusive on its own, each need not be viewed in isolation from the others, solely as an independent variable. Blue Cross, 110 F.3d at 334.

A showing of likelihood of confusion will establish that a risk of irreparable harm exists as to the reputation of the trademark. Worthington Foods, 732 F.Supp. at 1460. The Court can consider if there is any irreparable harm that the plaintiff is likely to suffer should the permanent injunctive relief not be granted.  Plaintiff did not seek preliminary relief, and now seeks no monetary relief. Harm suffered by a plaintiff is irreparable when "it is not fully compensable by monetary damages." Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 578 (6th Cir. 2002) (citing Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992)).

The Court should also consider the effect of injunctive relief on public interests. Certified Restoration Dry Cleaning, 511 F.3d at 542.  Two fundamental purposes of trademark law are (1) protecting the consuming public by preventing consumer confusion and deception in the marketplace; and (2) protecting trademark owners' proprietary interests in their marks. Lorillard, 453 F.3d at 383 (citing Ameritech, Inc. v. Am. Info. Techs. Corp., 811 F.2d 960, 964 (6th Cir. 1987)). The plaintiffs have engaged in a series of actions that are tantamount to abandoning their use of the SOUND CHOICE mark, by ceasing to actively market their products, but instead to engage in serial litigation. In the end the court's equitable powers should be attenuated when Slep-Tone is in essence using the SOUND CHOICE marks for improper purposes. The public interest also can be weighed in the defendants' defense of unclean hands on the part of the plaintiff.

The trademark laws ensure protection of the consumer as well as the producer of the product. See Two Pesos, 505 U.S. at 763, 112 S.Ct. at 2755; Park 'N Fly, 469 U.S. 189, 105 S.Ct.

-13-

658.  The defendants have raised a number of affirmative defenses that are particularly relevant when the plaintiff disclaims actual damages and seeks only equitable relief.  In particular, the defendants allege that the products sold by Slep-Tone under the SOUND CHOICE mark are sold in violation of a number of state and federal laws.  Thus, defendants allege that plaintiff seeks equity with unclean hands.  Cases originating in the Sixth Circuit support the general rule that the alleged unclean hands are relevant when the acts arise in relation to the matter in dispute. See, for example, Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1383 (6th Cir. 1995)("The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party."); The Scooter Store, Inc. v. Spinlife.com, LLC, 2011 WL1460438, at *6 (S.D. Ohio, Apr. 18, 2011)("The doctrine of unclean hands is 'a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant," quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814, 65 S. Ct. 993 (1945)).

## V.    EVIDENTIARY ISSUES THAT MAY ARISE AT TRIAL

A number of motions *in limine* have been previously filed (in 2011) with respect to evidentiary issues. The issues raised by Defendants include:

Doc. 71          Motion to Exclude Testimony of T. J. Richissin ….Mad Pro Audio Employees

Doc. 72          Motion *in limine* to exclude opinion testimony of D. Sems (fact witness only)

Doc. 74          Motion *in limine* to Exclude Untimely Produced Evidence from Plaintiff

The Plaintiff is also likely to seek to exclude testimony.

## <u>ATTACHMENTS TO DEFENDANTS' TRIAL BRIEF</u>

1: Defendants' Exhibit List.

2: Defendants' Witness List

3: Defendants' Proposed Jury Instructions

4: Defendants' Proposed *Voir Dire* Questions.

 

Respectfully submitted,

<u>s/ John J. Okuley</u>
Trial Attorney
John J. Okuley, Esq.  (0076748)
Okuley Smith LLC
Mueller-Smith Building
7700 Rivers Edge Drive
Columbus, OH 43235-1355
Tel.:  614-436-0600
Fax:  614-436-0057
Email: *jokuley@okuleysmith.com*

<u>Co Counsel:</u>
Brice O. Recker (0005094)
Okuley Smith LLC
Mueller-Smith Building
7700 Rivers Edge Drive
Columbus, OH 43235-1355
Tel.:  614-436-0600
Fax:  614-436-0057
Email*: brecker@okuleysmith.com*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Defendants' Trial Brief is being filed on August 14, 2013 using the Court's CM/ECF system, which will send a Notice of Docketing Activity via electronic mail to all counsel of record in this matter, and a separate notice will be sent particularly to counsel for the Plaintiff as follows:

Mr. James M. Harrington
Email jharrington@harringtonlawpc.com

Date: 14 August 2013          */ John J. Okuley /*

John J. Okuley